# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **BAYSTATE FRANKLIN MEDICAL CENTER** *et al.*,<br><br>                       Plaintiffs,<br><br>                       v.<br><br>**ALEX M. AZAR II, in his official capacity as United States Secretary of Health and Human Services**,<br><br>                       Defendant. | Case No. 1:17-cv-00819 (TNM) |

## MEMORANDUM OPINION

The U.S. Department of Health and Human Services reimburses hospitals for certain costs they incur in providing healthcare to Medicare beneficiaries. To pay the hospitals, the Department uses a Prospective Payment System ("PPS") to establish predetermined rates for each treatment type. The PPS features a "wage index," a multiplier that adjusts reimbursements to reflect regional variations in labor costs. *See* 42 U.S.C. § 1395ww. Hospitals submit annual cost reports to the Department, which are used to determine regional urban and rural wage rates. For each state, the rural rate acts as a "floor" ensuring that state hospitals receive at least that rate for their labor costs. *See* Pub. L. No. 105-33, § 4410 (1997).

Massachusetts-based Baystate Franklin Medical Center and its affiliates ("Baystate" or "Plaintiffs") challenge the Department's calculation of the wage index. The Department raised Baystate's 2017 index to the state's rural floor, as Plaintiffs' own labor costs were lower. Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s MSJ Mem.") 7, ECF No. 23-1. Remarkably, Nantucket Cottage Hospital ("Nantucket") is Massachusetts' only "rural" hospital as defined by 42 U.S.C. § 1395ww, and thus it sets the state's PPS reimbursement floor. Compl. 6, ECF No. 1.

Nantucket erroneously reported some of its labor costs in 2015, causing its average hourly wage to be understated. *Id*. It failed to seek corrections to its data until more than seven months after a nationwide deadline for such requests. Def.'s Mem. in Supp. of Def.'s Cross Mot. for Summ. J. ("Def.'s Cross-MSJ. Mem.") 9, ECF No. 25-1. The Department denied Nantucket's untimely request and used the earlier submitted data to calculate the index. *Id*. at 10. As a result, Baystate received $19,907,000 less in 2017 reimbursements than it would have if Nantucket had timely submitted accurate data.

Baystate asserts that, as applied to Plaintiffs, the decision to use Nantucket's uncorrected data was arbitrary, capricious, and an abuse of discretion. Compl. 8. Baystate also challenges the Department's interpretation of 42 U.S.C. § 1395oo, the statute that establishes the Provider Reimbursement Review Board ("Board"). Plaintiffs contend that the Board must have the authority to grant relief when one hospital's claim is based on the inaccuracy of another's data.

Department Secretary Alex Azar[1] (the "Secretary") disagrees. He alleges that using the uncorrected data was a reasonable exercise of the agency's discretion, as Nantucket missed a clearly articulated deadline and because of the Department's interests in finality and efficiency. Def.'s Cross-MSJ. Mem. 9, 16. The Secretary further argues that the Board's grant of expedited review and the instant case validate the Department's interpretation. *Id*.

Both parties seek summary judgment on the undisputed administrative record. I find that the Department's decision to require hospitals to correct their own wage data within program deadlines was reasonable, that Baystate's reimbursement was increased to reflect the region's labor costs as contemplated by the wage index statute, and that 42 U.S.C. § 1395oo does not

---

[1] Mr. Azar was sworn in as the Secretary of Health and Human Services on January 29, 2018. He therefore automatically became the named Defendant pursuant to Federal Rule of Civil Procedure 25(d).

obligate the Board to grant relief based on the inaccuracy of another hospital's data. I will therefore grant summary judgment for the Secretary.

## I.

Medicare is a federally funded program that provides health insurance for the elderly, the disabled, and for people with end-stage renal disease. *See* 42 U.S.C. § 1395 *et seq.* A "complex statutory and regulatory regime governs [the] reimbursement" of healthcare providers who treat Medicare beneficiaries. *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 404 (1993). The Centers for Medicare and Medicaid Services (CMS), a division within the Department, administers the program and, through the PPS, the reimbursement of participating hospitals. *See Anna Jacques Hosp. v. Burwell*, 797 F.3d 1155, 1157 (D.C. Cir. 2015).

Wages and related costs are a "significant component" of these reimbursements, and these costs "vary widely across the country." *Regents of the Univ. of Cal. v. Burwell*, 155 F. Supp. 3d 31, 37 (D.D.C. 2016). Accordingly, Congress mandates that the PPS rates attributable to labor costs be adjusted for "area differences in hospital wage levels." 42 U.S.C. § 1395ww(d)(3)(E)(i). The Department must compute a factor "reflecting the relative hospital wage level in the geographic area of the hospital compared to the national average hospital wage level." *Id*. This factor is known as the "wage index." *Se. Ala. Med. Ctr. v. Sebelius*, 572 F.3d 912, 914-915 (D.C. Cir. 2009).

CMS calculates the wage index annually. Hospitals first submit their cost data to third party "fiscal intermediaries" (typically insurance companies), that then review the data for accuracy and to ensure that cost increases do not exceed predetermined "edit thresholds." *See Dignity Health v. Price*, 243 F. Supp. 3d 43, 46 (D.D.C. 2017). If the fiscal intermediary believes corrections are necessary, it must provide the hospital with an opportunity to respond.

*Id*.  If a hospital fails to respond to the issues the intermediary raises in the review process, the intermediary must notify the relevant state hospital association, warning members that "a hospital's failure to respond to matters raised by [the intermediary] can result in [the] lowering of an area's wage index value." *Id*.  After the review and corrections process is complete, the intermediaries transmit the data to CMS.

Using this data, CMS calculates the average hourly wage rate for hospitals in each geographic area.  *Anna Jacques Hosp*., 797 F.3d at 1159.  Geographic areas typically correspond to the "metropolitan statistical areas" defined by the Office of Management and Budget.  Any hospital not located in a metropolitan statistical area (or in a similarly defined urban area) is deemed to be in a "rural area."  42 U.S.C. § 1395ww(d)(2)(D)(ii).

CMS then determines the national average wage rate and divides the regional rate by the national rate for each geographic area to arrive at the wage index.  *Anna Jacques Hosp*., 797 F.3d at 1159.  The index is thus a ratio of each geography's labor cost to the national average: an "index of 1.0 means a given area is average [while] an index above 1.0 indicates higher than average wage costs, and thus a correspondingly higher" PPS reimbursement.  *Dignity Health*, 243 F. Supp. 3d at 46.  Recall that CMS adjusts each hospital's reimbursement for labor-related costs using the relevant regional index, unless that hospital's state rural floor is higher.

Because each hospital's wage data impacts the national average and that hospital's regional average, "errors or omissions by one hospital can lower (or increase) PPS rates for other hospitals in its area" and indeed, for each hospital in the country.  *Id*.; *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1228 (D.C. Cir. 1994).  All wage index adjustments must be budget-neutral, meaning that an increase in payment to one hospital requires offsetting decreases to others.  Pub. L. No. 105-33, § 4410(b) (1997).

4

Once CMS has completed these calculations, it publishes a preliminary wage index and establishes a deadline for hospitals to request revisions to their data. *Dignity Health*, 243 F. Supp. 3d at 46-47. For the 2017 Wage Index, this preliminary data was published in May 2015, and the deadline to request revisions was that September. J.A. 17, ECF No. 32. The fiscal intermediaries notified hospitals that this data was available and "inform[ed] hospitals of their opportunity to request revisions." *Id*.

After this deadline passed, the Department published a proposed wage index for the year in the federal register, allowing hospitals to request changes only in "those very limited circumstances involving an error by the [fiscal intermediaries] or CMS that the hospital could not have known about before its review of the final wage index data files." FY 2017 PPS Proposed Rule, 81 Fed. Reg. 24,946, 25,073 (Apr. 27, 2016). The Department then published the final wage index in a Final Rule. It allowed hospitals to seek corrections to the final index ("midyear corrections") only if a fiscal intermediary made a tabulating error and the hospital could not have known about the error before publication of the final rule. *Id*. Midyear corrections are "not available to a hospital seeking to revise another hospital's data that may be affecting the requesting hospital's wage index for the labor market area." *Id*.; *see also Dignity Health*, 243 F. Supp. 3d at 47 (summarizing the Department's FY 2004 process, which contained identical language about the index's deadlines and limited exceptions). Because of the "extensive amount of time" this process takes, the Department calculates each year's index using data from hospital cost reports collected several years earlier. *Anna Jacques Hosp.*, 797 F.3d at 1159.

To determine the index applicable to Baystate in FY 2017, CMS used cost reports from FY 2013. Baystate's wage index was calculated to be 1.0177, which was necessarily above the national average (1.0), but below Massachusetts' rural floor of 1.1822 set by Nantucket. Pl.'s

5

MSJ Mem. 7. Nantucket's FY 2013 cost report contained errors that caused its hourly wage rate to be understated, and its index would have been 1.2659 if the Department had accepted the hospital's tardy corrections. *Id*. at 9. A little over seven months after the September 2015 deadline for data revision requests, Nantucket submitted a letter to CMS requesting corrections to its original submission. Def.'s Cross-MSJ. Mem. 9. CMS denied Nantucket's request and indicated it would use the uncorrected data, noting that "those corrections fall outside the scope of the FY 2017 Wage Index Development Timetable." J.A. 22. Baystate alleges that use of the uncorrected data cost Plaintiffs $19,907,000 in lost reimbursement. Pl.'s MSJ Mem. 9.

For 2017, the Massachusetts rural floor was imputed to 15 other hospitals. *Id*. at 7. Following publication of the proposed index, some of these hospitals submitted comments to the agency "urg[ing] CMS to exercise its discretion in this situation to grant [Nantucket's untimely] wage data correction requests," stating that it would be "sound public policy" for the Department to use the most accurate data available. J.A. 161. Conversely, other commentators urged the Department not to allow the corrections. Some argued that "CMS would establish a troubling precedent by disregarding CMS rules and regulations, which provide ample opportunity to correct wage data through the agency's normal review process and deadlines." *Id*. Others "noted that the redistributive effect of nationwide rural floor budget neutrality would further lower wage index values for hospitals nationwide to pay for additional increases in Massachusetts's rural floor." *Id*.

Responding to these comments and explaining its decision not to use Nantucket's corrected data, the Department stated that the wage index's timetable "has been established through rulemaking, and plays an important role in maintaining the integrity and fairness of the wage index calculation." *Id*. The Department further reasoned it has "consistently stated"

6

during the annual PPS process "that hospitals that do not meet the procedural deadlines . . . will not be afforded a later opportunity to submit wage index data corrections." *Id*.

A hospital that is "dissatisfied with a final determination of the Secretary" about its reimbursement payments may obtain a hearing before the Department's Provider Reimbursement Review Board. 42 U.S.C. § 1395oo(a)(1)(A)(ii). Baystate filed a timely appeal before the Board, which concluded that it "does not have the authority to grant the remedy" sought because the 2017 wage index Final Rule (like the published wage indices from prior years) did not "establish an administrative process for providers to challenge the calculation of another hospital's wage index." J.A. 5. Anticipating this holding, Baystate requested, with the Secretary's consent, expedited review so that Plaintiffs could seek immediate judicial review of the Board's decision. Pl.'s MSJ Mem. 10. The Board granted that request, and Baystate filed this action.

Baystate alleges that the Secretary's FY 2017 Final Rule concerning the wage index is based on an impermissible interpretation of the Medicare Act and is arbitrary and capricious for two reasons. First, Plaintiffs contend that the Final Rule does not "correctly reflect the relative hospital wage level in [Baystate's] geographical area compared to the national average, in contravention of 42 U.S.C. § 1395ww(2)(H)." *Id*. at 11. Second, they challenge the Rule's failure to provide a process for one hospital to contest the calculations of another's cost data. *Id*. Both parties seek summary judgment on whether the Secretary's decision to use Nantucket's uncorrected wage data and to limit the scope of the Board's capacity to grant relief constituted impermissible, unreasonable, and arbitrary and capricious actions.

7

## II.

To prevail on a motion for summary judgment, a movant must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Once this showing has occurred, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250.

Both Baystate and the Secretary have moved for summary judgement and largely agree on the salient facts of this case.[2] The parties disagree, however, on whether the Secretary's decisions were based on reasonable interpretations of 42 U.S.C. §1395ww. The parties also contest whether these decisions were arbitrary and capricious in violation of the Administrative Procedure Act ("APA").

To evaluate the Secretary's interpretation of a statute he administers, the reviewing court must first determine whether Congress has "directly spoken to the precise question at issue." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984). If Congress's intent is clear, "that is the end of the matter." *Id*. If the statute is instead "silent or

---

[2] The Secretary did not concede that Nantucket's initial data submission did in fact contain reporting errors leading to an understating of its wage rate. *See, e.g.*, Def.'s Cross-MSJ. Mem. 14 (discussing the "alleged error" in Nantucket's data). For the purposes of this opinion, I assume the Plaintiffs' allegations are correct. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("on summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion").

ambiguous with respect to the specific issue," the court must defer to the Secretary's "reasonable interpretation" of that statute. *Id.* at 844. The court must also take "special note of the tremendous complexity of the Medicare statute. That complexity adds to the deference due to the Secretary's decision." *Methodist Hosp.*, 38 F.3d at 1229. This heightened deference is "all the more warranted when, as here, the regulation concerns a complex and highly technical regulatory program." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).

The APA requires that the reviewing court "set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). For the Secretary's decisions to be upheld, he must have "examined the relevant data and articulated a satisfactory explanation for [his] action including a rational connection between the facts found and the choice made." *Murray Energy Corp. v. F.E.R.C.*, 629 F.3d 231, 235 (D.C. Cir. 2011).

Applying this double dose of deference and for the reasons set forth below, I conclude that the Secretary's decisions were based on a permissible construction of the Medicare statute and were neither arbitrary nor capricious.

**III.**

The Secretary's decision to enforce longstanding PPS program deadlines and use Nantucket's uncorrected data was reasonable and based on a permissible reading of the Medicare statute. Even without the proposed correction, Baystate received a higher wage index and thus greater remuneration than it would have received had the Secretary relied on Plaintiffs' labor costs alone. Baystate thus received the benefit of a reimbursement "reflecting the relative hospital wage level in the geographic area of the hospital" as 42 U.S.C. § 1395ww requires. The appeals process accorded to Baystate by the Department was also based on a permissible reading

9

of 42 U.S.C. § 1395oo, as that statue does not require that one hospital be allowed to contest the factual submissions of others.

## A.

As Baystate admits, Congress has not directly spoken to the precise question at issue here. Pl.'s MSJ Mem. 13 n.8. In fact, the Medicare Act "expressly affords the Secretary flexibility and discretion in compiling data and calculating the wage index." *Anna Jacques Hosp.*, 797 F.3d at 1164. The statute notes that the Secretary "shall update the [wage index] . . . on the basis of a survey conducted by the Secretary (and updated as appropriate) of the wages and wage-related costs" borne by participating hospitals. 42 U.S.C. § 1395ww(d)(3)(E). Analyzing this language, the D.C. Circuit has concluded that the statute "merely requires the Secretary to develop a mechanism to remove the effects of local wage differences [and] does not specify how the Secretary should construct the index." *Anna Jacques Hosp.*, 797 F.3d at 1164. It is silent about how the survey must be conducted, the deadlines to be employed, and the extent to which hospitals should be allowed to submit corrected data responses. And Baystate concedes that the Secretary "undoubtedly enjoys broad discretion in developing the wage index calculation process." Pl.'s Mem. in Opp. to Def.'s Cross-Mot. 2, ECF No. 27. Thus, the only *Chevron* issue is whether the Secretary's exercise of his broad discretion was reasonable.

The Secretary's explanations for rejecting Nantucket's corrected data demonstrate the reasonableness of his decision. The proposed corrections fell "outside the scope of the FY 2017 Wage Index Development Timetable." J.A. 22. The Department has an interest in "maintaining the integrity and fairness of the wage index calculation" and has "consistently" emphasized the importance of meeting the deadlines in each year's promulgation of the PPS program rules. J.A. 161. Because of the lengthy and complex index development process, and because each

10

hospital's data impacts the calculations for both its regional index and the national index, it is not unreasonable for CMS to place the burden on individual hospitals to correct their errors in a timely manner. Needless to say, hospitals have a strong financial motivation to ensure they are submitting timely, accurate data. Moreover, were the Secretary to allow Nantucket to correct its data after the deadline, he would presumably need to allow other hospitals to make similar corrections. Allowing untimely revisions from hospitals across the country without a firm deadline could result in substantial delays to the Secretary's administration of the PPS program. Creating and strictly adhering to a timetable for the annual wage index thus represents a permissible implementation of the statutory language.

The Secretary's refusal to allow other hospitals, like Baystate, to correct Nantucket's data was also reasonable and fully in accord with controlling precedent. In *Methodist Hospital*, a Sacramento-area hospital submitted inaccurate wage data eventually used to calculate the 1984 wage index. 38 F.3d. at 1228. The error caused the hospital's actual labor costs to be understated, and thus lowered the area's index. Other Sacramento hospitals recognized the error once the index was published, and appealed to the Board, concerned that the error would lower their remuneration too. *Id*. However, the Department "refused to apply the recalculated wage index retroactively." *Id*.

The D.C. Circuit upheld the Department's decision and granted summary judgment to the Secretary. It noted that "a change in a single wage index could affect the payment rates applicable for each hospital" and that under such circumstances "retroactive corrections would cause a significant, if not debilitating disruption to the Secretary's administration of the already-complex Medicare program." *Id*. at 1233. The court concluded that it was simply "not arbitrary and capricious of the Secretary to decide that the administrative burden of recalculating the

reimbursement rate for every hospital in a metropolitan area every time any hospital in that area makes an error in reporting wage data outweighs the increase in accuracy that would result." *Id*.

So too here. Baystate's attempts to distinguish its claims from those raised in *Methodist Hospital* are unpersuasive. First, Plaintiffs argue that the wage index assigned to Baystate was required to reflect a comparison of Massachusetts' rural wage level to the national average and that it "reflect[ed] nothing of the sort because it harbors a significant and uncorrected error." Pl.'s MSJ Mem. 12. However, Baystate did receive an index reflecting not their lower labor costs, but the higher costs claimed by Nantucket.

Switching from indices to dollars and cents shows what is at stake. Nantucket's uncorrected average hourly wage for 2017 was $43.78. Pl.'s MSJ Mem. 8. Even without the correction Baystate seeks, this average reflects regional trends. Springfield, Massachusetts, had an average hourly wage of $41.84, Pittsfield's average was $44.58, and Worcester's average was $47.83. *Wage Index Table by CBSA – FY 2016*, CENTERS FOR MEDICARE & MEDICAID SERVICES ("CMS Wage Index Table") (last visited July 30, 2018), https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/AcuteInpatientPPS/Downloads/FY2016-CMS-1632-FR-Table-2-3.zip. Baystate's request to be compensated at Nantucket's proposed correction would result in a reimbursement rate of $60.50 per labor hour. Pl.'s MSJ Mem. 8. This would be a substantial windfall, implying that Baystate's average hourly labor costs were greater than those in Boston ($54.88), New York City ($53.67), and Los Angeles ($51.77). *See* CMS Wage Index Table. Thus, the assertion that Baystate's actual reimbursements failed to reflect regional wage rates is undermined by the region's labor cost data.

Next, Baystate argues that, even if the Secretary's decision was reasonable as applied to Nantucket, it was arbitrary and capricious with respect to Plaintiffs because "Baystate and other hospitals had no control over or ability to identify errors in [Nantucket's] cost report." Pl.'s MSJ Mem. 15. Moreover, the Secretary's explanation, Plaintiffs argue, "contains no indication that the Secretary even considered the impact that [Nantucket's] errors would have on other hospitals and whether fairness was served by subjecting them to [Nantucket's] error." *Id*. However, the administrative record belies this claim.

While it is true enough that Baystate had no control over Nantucket's cost reporting, the Secretary weighed the potential unfairness of Baystate's lack of control against the consequences of allowing data corrections after the deadline. The Secretary considered the positions of Baystate, the Massachusetts Health and Hospital Association, and hospitals and associations from around the country. J.A. 161. He weighed the Massachusetts area hospitals' interests in allowing the correction and obtaining a higher reimbursement against the "further lower wage index values for hospitals nationwide" that would result from raising the state's rural floor.[3] *Id*. He also considered the fairness of allowing untimely corrections given the program's well-documented and consequential deadlines. *Id*. Thus, the Secretary's proffered explanations do address the soundness of his decision with respect to third parties like Baystate.

---

[3] Colorfully summarizing the opposition to Nantucket's requested correction, the Alabama Hospital Association decried the "Bay State Boondoggle," noting that "manipulation" of the rural floor policy by the Massachusetts Hospital Association and its partners has cost Alabama's hospitals $56.7 million from 2012 – 2016. Similar sentiments were expressed by hospitals and associations from other states. *See* J.A. at 52, 99, 119. While rural wage costs would typically be lower than urban costs, Nantucket, which is situated on a remote holiday island of the rich and famous, has wage costs that exceed those of the priciest cities in the country. *See* CMS Wage Index Table. And since Nantucket is fortuitously the only Massachusetts hospital categorized as "rural," its rates are imputed to the 15 other Massachusetts hospitals, to the detriment of out-of-state hospitals. Thanks to the designation of Nantucket as Massachusetts' sole rural hospital, in 2012 alone, Massachusetts hospitals received an extra $275 million in reimbursements, which is about $225 million more than the next highest beneficiary of the rural floor system—New Jersey. *See* U.S. Gov't Accountability Off., GAO-13-334, Legislative Modifications Have Resulted in Payment Adjustments for Most Hospitals 13 (2013).

Finally, Baystate contends that the Secretary must use "the most reliable evidence available" to ensure calculations that are "reasonably accurate." Pl.'s Mem. in Opp. to Def.'s Cross-Mot. 5 (citing *Baystate Med. Ctr. v. Leavitt*, 545 F. Supp. 2d 20, 42-44 (D.D.C. 2008)). But the Secretary did use the best data available to him within the timelines established by the PPS program. Moreover, the cases Plaintiffs rely on indicate that the "agency's duty" is to "produce figures that can be considered sufficiently accurate." *Baystate Med. Ctr.*, 545 F. Supp. 2d at 41. *See also Methodist Hosp.*, 38 F.3d at 1230 (holding that when the Department used the most reliable data available at the time, it was not required to recalculate reimbursements based on subsequently corrected data); *Mt. Diablo Hosp. v. Shalala*, 3 F.3d 1226, 1233 (9th Cir. 1993) (finding that the Department had used the most reliable data available and that it was not required to recalculate the wage index because the data initially used did not account for part-time workers). In fact, courts have seemingly required the Department to retroactively include or exclude certain data only when the Department has, on its own, done so in the past. *See, e.g.*, *Centra Health, Inc. v. Shalala*, 102 F. Supp. 2d 654, 659 (W.D.Va. 2000) (finding that it was feasible for the Secretary to exclude certain hospital cost data from wage index calculations and that it was arbitrary not to do so because the Secretary had excluded that data for 1986 and 1996). The Secretary was therefore justified in relying on the reports provided by Nantucket and other hospitals within the window for submitting and correcting labor cost data.

In summary, the Secretary reasonably exercised his considerable discretion in enforcing the wage index's annual deadlines against Nantucket. Moreover, the resulting reimbursement Baystate received was reasonable given regional labor costs and the Secretary's interests in efficiently and fairly administering the PPS program.

**B.**

Baystate contends that the Secretary "flouted the statutory right conferred on providers to obtain wage index relief from the [Board]" because of his position that a hospital "is entitled to no relief where [a challenge before the Board] is based on inaccuracies in another hospital's data." Pl.'s MSJ Mem. 18-19. However, nothing in the Medicare statute obligates the Board to provide such relief, and the Secretary's interpretation of the statute is reasonable. Section 1395oo(a) of the Medicare Act states that:

> Any provider of services *which has filed a required cost report* within the time specified in regulations may obtain a hearing *with respect to such cost report* by a Provider Reimbursement Review Board (hereinafter referred to as the "Board") which shall be established by the Secretary in accordance with subsection (h) and (except as provided in subsection (g)(2)) any hospital which receives payments in amounts computed under subsection (b) or (d) of section 1395ww of this title and which has submitted such reports within such time as the Secretary may require in order to make payment under such section may obtain a hearing with respect to such payment by the Board, if such provider . . . is dissatisfied with a final determination of the Secretary as to the amount of the payment . . . .

42 U.S.C. § 1395oo(a) (emphasis added).

The statute does not mention a hospital's right to seek relief from the Board based on erroneous cost reports submitted by another hospital. To the contrary, the statute appears to allow a hospital to obtain a hearing before the Board only to challenge the cost reports that it filed. *Id*. *See also Dignity Health*, 243 F. Supp. 3d at 53 (noting that the Department's 2004 Final Rule "described the process for hospitals to review and revise *their* . . . wage data" and the Board's "focus on a hospital's ability to challenge *its own* wage data") (emphasis in original). The Secretary's determination that the Board cannot grant relief where providers challenge other hospitals' data is at least permissible under, if not required by, the plain language of § 1395oo(a).

15

The Secretary's decision was also reasonable. As discussed above, a change in one hospital's data impacts the wage index for every other hospital in its region and, indeed, for every hospital nationwide. Additionally, the structure of the reimbursement program means that hospitals have significant financial incentives to ensure that their own data submissions are accurate. *See Methodist Hosp.*, 38 F.3d at 1233 (discussing the "serious fiscal repercussions at stake" for hospitals submitting their cost reports). Finally, because the Board lacked the authority to grant Plaintiffs the relief they seek, it granted expedited judicial review, allowing Baystate to bring the matter before this Court. Def.'s Cross-MSJ. Mem. 16. Plaintiffs have therefore not been deprived of a meaningful opportunity to challenge the use of Nantucket's uncorrected cost data.

## IV.

For the foregoing reasons, the Plaintiffs' Motion for Summary Judgment will be denied, and the Secretary's Cross-Motion for Summary Judgment will be granted. A separate order will issue.

Dated: July 31, 2018 TREVOR N. MCFADDEN, U.S.D.J.